## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **ENCOMPASSING ACREAGE LLC, UNITED TANK TRAILER CO., & CUSTOM TANK SERVICES LLC** ) ) ) ) ) | Case No.<br><br>Judge: |
| Plaintiffs, ) ) ) | |
| v. ) ) | **VERIFIED COMPLAINT AND JURY DEMAND** |
| **CITY OF ROMULUS and DAVID ALLISON** ) ) ) ) | |
| Defendants. ) ) | |

## VERIFIED COMPLAINT

Plaintiffs Encompassing Acreage LLC ("EA"), United Tank Trailer Co. ("UTT") and Custom Tank Services LLC ("CTS"), for their Complaint against Defendant City of Romulus (the "City" or "Romulus") and Mr. David Allison ("Allison"), state as follows:

## NATURE OF THE COMPLAINT

1.     EA is a property owner in Romulus. It leases its property to related companies UTT and CTS, which conduct business in Romulus. EA's property was damaged by a fire in Feb. 2021 of undetermined origin. The fire damaged the building, but it left a primary structural element in place – a concrete platform connected to a drainage system and the City's sewers. The concrete platform is in a

1

suitable condition for connection to columns to join the concrete platform to the roof. This surviving structural element is an "existing" building under the governing codes. EA sought a permit from Romulus to repair its existing building.

2.      In seeking the permit, EA's agent (a CTS employee) identified EA as the owner and UTT as a tenant. She described the fire and EA's desire to repair the building to the City. The City then required her to fill out the specific permit form it provided, making it clear that none other would be accepted. The City instructed her how to fill out the form. In short, the City unilaterally decided which code in the Romulus framework would apply in EA's application for a permit.

3.      The City wrongly examined the permit application under the 2015 International Building Code ("IBC") and the 2015 International Fire Code ("IFC"). The City denied the permit. Specially, Romulus alleged in conclusory fashion that EA was erecting a "new" building that was subject to the requirement of an automatic sprinkler system. This is not required for "existing" buildings except in limited cases that do not apply here.

4.      EA asked the City attorney for the factual basis supporting the denial. No response or evidence was provided, but the denial letter invited EA to appeal. EA appealed. The City's Construction Board of Appeals affirmed. The affirmation, not supported by substantial evidence, sustained an arbitrary and capricious decision that misinterpreted and misapplied both the IBC and the IFC. Under the Romulus

framework and the plain language of codes, the correct code addressing the repairs at issue is the 2015 Michigan Rehabilitation Code ("MRC"). The City did not apply the MRC in its initial review, and the Board did not apply the MRC in the context of the appeal.

5.      The facts set forth below state EA's claims of an "inverse taking / condemnation" under federal and state law. The facts state claims of the City's violation of the prohibition in the Eighth Amendment to the US Constitution to be free of excessive fines involved in an inverse taking. The facts state claims the City's and Allison's actions amount to a denial of Plaintiffs' substantive and procedural due process rights. The facts further state claims for promissory estoppel against Allison. Additionally, the facts also state claims for gross negligence against the City and Allison. Defendants' intentional and willful actions are the proximal cause of injury to Plaintiffs. Thus, Plaintiffs seek all available relief in law and equity.

## **PARTIES**

6.      Plaintiff EA is a Michigan LLC with operations in Romulus, MI until the fire. Temporary operations remain in Wayne County, MI.

7.      Plaintiff UTT is a Michigan corporation with operations in the EA facility in Romulus, MI until the fire. Temporary operations remain in Wayne County, MI.

8.      Plaintiff CTS is a Michigan LLC with operations in the EA facility

Romulus, MI until the fire. Temporary operations remain in Wayne County, MI.

9.      Defendant City of Romulus is a Municipal Corporation in Wayne County,

MI.

10.     Defendant Allison is being sued in his official capacity as Fire Prevention

Chief and in his personal capacity. Upon information and belief, Allison is a

natural person who is a resident of Michigan.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C.

§ 1331 (federal question jurisdiction). In particular, EA has claims under the 5th

and 14th Amendments of the United States Constitution that give rise to original

federal question jurisdiction under *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019).

This Court also has federal question jurisdiction for the claims brought under the

8th Amendment of the United States Constitution and 42 U.S.C. § 1983. This Court

has subject matter jurisdiction over the remaining claims under 28 U.S.C. § 1367

(supplemental jurisdiction). In particular, Defendants' conduct in those remaining

claims are so related to claims in the counts with original jurisdiction that they

form part of the same case or controversy.

12.     This Court has personal jurisdiction over Romulus because Romulus is a

Municipal Corporation in this judicial district.

4

13.     This Court has personal jurisdiction over Allison because upon information and belief Allison is a Michigan resident.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because Romulus is a Municipal Corporation in this judicial district and because, upon information and belief, Allison resides in this judicial district. Additionally, a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated in this judicial district.

## FACTUAL BACKGROUND

### I.      PLAINTIFFS EA, UTT & CTS

15.     EA was formed in 2019, primarily to own the real estate at 10200 Harrison Street in Romulus. Before the fire, EA's property was used for the operations of EA's related companies, UTT and CTS.

16.     UTT was first formed in 2010 as a tank trailer dealership. UTT is the largest of the three companies by sales. The business generally engages in the sale of new and used tank trailers.

17.     CTS was formed in 2016 as a full-service tank repair facility. CTS is the largest of the three companies by number of employees. Generally, tanks in need of repair are emptied and cleaned and pulled into the Harrison Street property for whatever repairs are needed. CTS then performs the repairs.

18.     Mr. Richard Garbacik ("Garbacik") has an ownership interest and is the President of all three entities. This fact is and has been known to Romulus and its officials at all relevant times.

## II.     THE FIRE

19.     Upon information and belief, the building at 10200 Harrison Street property was originally built in 1977. When Garbacik first brought his companies to the Romulus property, he upgraded the structure to get a Certificate of Occupancy. He ensured there were fire protections in place, such as fire extinguishers, alarms, and the like, but these tools existed in the context of an old building – like many commercial and industrial buildings in Romulus and surrounding areas.

20.     On Feb. 22, 2021, a fire destroyed much of the 10200 building. Based upon their report, the Romulus Fire Department worked for over eight hours to extinguish the fire, provide salvage and overhaul services, and investigate. Their report indicates that the cause was "unintentional," the area of origin was "service facilities," and the heat source was "undetermined."

21.     The building was extensively damaged and required repairs to become usable for its ordinary and customary purpose.

22.     What remained of the damaged building was a complete structural concrete platform attached to a drainage system and to the City's sewers. The platform was

in a condition still suitable to support columns connecting the concrete platform to a roof.

23.    EA wished to repair its building so that UTT and CTS could return to making the customary and commercial use of the property.

## III.    THE ROMULUS FRAMEWORK OF CODES

24.    In 2017, Romulus adopted 2015 Michigan Rehabilitation Code ("MRC"), the 2015 Michigan Building Code ("MBC" or "IBC"), and the 2015 International Fire Prevention Code ("IFC").

25.    Generally, the scope of the MRC is that it "shall apply to the repair, alteration, change of occupancy, addition, and relocation of existing buildings…" MRC §101.2. The MRC provides flexibility to permit the use of alternative approaches to achieve compliance with minimum requirements to safeguard the public health, safety, and welfare.

26.    Generally, after a fire, the scope of the IBC and the IFC is for application to structures, facilities and conditions arising *after* the adoption of the code [2017], except for four narrow exceptions. IFC §102.1. The only exception that arose in any stage of the process with Romulus is the exception for "existing structures, facilities and conditions that, in the opinion of the fire code official, constitute a distinct hazard to life or property." IFC §102.1[4].

## IV. ALLISON'S & THE CITY'S EGREGIOUS CONDUCT TOWARD PLAINTIFFS

27. In their acts and omissions over the past two years, Allison and the City engaged in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results to EA, UTT or CTS.

28. On or about April 25, 2022, CTS's office manager, as an agent for EA, applied for a permit to repair the 10200 Harrison building. She is not an architect, a civil engineer, or a lawyer. She was tasked with facilitating EA's desired repairs as soon as possible. She explained EA's fire situation to the City employee as well as EA's desire to begin repairs as soon as possible. She had not been in this situation before, and she made that known to the City employee.

29. The City employee then required the EA agent to fill out a particular form and instructed her how to do so. The EA agent did not select a box on the form for "Applicable Code," which listed only the IBC and the residential code as options. The MRC was not an option on the form. The EA agent did check boxes for an "improvement type" of "repair/replacement." She made mention of the fire in handwritten notes, as well as noting EA's desire for "erecting building in the same location as existing building."

30. Knowing EA and its related businesses were in a state of distress, the City's Code Official James Wegienka ("Wegienka") first responded with a suggestion to seek additional zoning permits relating to a second driveway, adding time and

8

expense to the process. EA did not want to take this approach, so it sought the attention of Mayor McCraight, both by email and by personal visit.

31.   The Mayor refused to see EA's President, referring him to Wegienka, who in turn referred him to Allison.

32.   EA followed up with Allison throughout the summer. Allison shared his opinion that under the IBC and IFC, a fire suppression system including an automatic sprinkler system was required. Under this framework, a separate tap into to the water main across the street from the building would be required. This involved tearing up the street at EA's expense and at the inconvenience of all other Romulus residents. EA investigated the effort and expense, and EA found that it would be roughly $200K for such installation and equipment.

33.   This was an untenable burden for EA, so EA sought compromise. It proposed altering the use of the property to just UTT's dealership, noting that the fire's origin was in the service area. Allison was unbending, sticking to his feeling that the sprinklers should be installed. EA also suggested repairing just the structure to get the construction process under way without delay, and not operating any business until an agreement could be reached with the City as to use. Allison again was unbending.

34.   At one point during these exchanges, Allison affirmatively suggested that he would withdraw his requirement for a sprinkler if EA could find an insurer who

9

would be willing to insure the repaired building without a sprinkler system. Allison had the title and authority to do so, so EA complied. EA found such an insurer. The insurer informed Allison it would write a policy covering the building for fire without a sprinkler system.

35.    Allison reneged.

36.    Allison stuck by his initial impression, no matter what the facts were, and without any care to the harm he knew he and the City were continuing to cause EA, UTT, and CTS.

37.    EA's counsel, who reached out to Allison on July 20, 2022, pointed out the error in Allison's interpretation and application of the IFC and IBC. [Exh. A].

38.    Allison never replied in writing. Instead, through telephone exchanges, Allison maintained his steadfast determination that the IBC and IFC applied because he viewed the repair as building a "new" structure. He therefore refused to remove his requirement for a sprinkler system.

39.    On Sept. 16, 2022, the City attorney replied to the July 20 letter, officially denying the permit. [Exh. B].

40.    EA inquired as to the City attorney's factual basis for the denial. The City attorney never responded. EA also followed the City attorney's instructions for appeal to Construction Board of Appeals. Specifically, the City attorney directed EA to address its appeal to the Fire Department. It did. The appeal lingered in the

Fire Department because that was not the correct place to direct an appeal. After follow-up communications, EA was finally able to submit its appeal directly to the Construction Board of Appeals in Dec. of 2022.

41.     The City then informed EA's counsel of the absence of availability of Board members, and delayed setting a hearing. It was not until EA's counsel pushed again, noting the accrual of damage being caused to EA and its related companies due to the delay, that they finally set a hearing for Feb. 14, 2023.

42.     The City attorney did not appear for the hearing. Upon information and belief, the Board members who appeared already knew what their decision was going to be long before arguments were presented.

43.     EA's counsel argued that the proper code governing the situation was the MRC. He argued that the concrete platform (which was determined by a professional engineer to be in generally sound and stable condition) met the definition for an "existing" building or structure. This would cause the MRC to apply, which would allow the City to require a sprinkler system only if the existing access to the water main would support such a sprinkler system. The existing access does not.

44.     At the appeal hearing, EA's counsel noted that the repairs would be made with an eye to safety for EA, UTT, CTS, and the surrounding community. Modern materials (new steel, insulation, etc.) and methods would be used, and numerous

11

city inspectors would be reviewing progress every step of the way. A 2023 repair is fundamentally different from and safer than a long-standing 1977 construction vis-à-vis fire risk.

45.     EA's counsel also argued that existing buildings are "grandfathered" under the MRC. The policy behind grandfathering is to avoid requiring the victims of a property loss to upgrade an existing building. One Board member asked whether the term "grandfather" appeared in the code. This member was then informed that the terms "existing structure" and "existing building" are replete through the codes, which capture the concept of the long history of grandfathering.

46.     In the hearing, the Board members did not root their questions in the code's language. Instead, they relied on their personal experiences and anecdotes to impose a requirement on EA that is not imposed on other commercial building owners with old properties erected long before the IBC and IFC were adopted by Romulus in 2017.

47.     At one point, addressing a possibility that the concrete platform qualified as an "existing building," one of the Board members asked Allison if he believed a distinct hazard to life or property would be presented if EA did not install the automatic sprinkler system. Allison replied in the affirmative.

48.     Allison did not address why EA's repair presented such a hazard when similarly used commercial buildings in Romulus that had not repaired in many years did not.

49.     For example, there is a 1972 industrial building also on 7188 Harrison Street that, upon information and belief, is not required to install such an automatic sprinkler system. On information and belief, other older industrial buildings in Romulus are similarly free of the requirement: 29300 Goddard was built in 1970, and 7845 Middlebelt was built in 1980. If there is truly "a distinct hazard to life or property" in the opinion of Allison, then Allison and the City have an imminent danger on their hands with the numerous industrial properties to address. Upon information and belief, they have not and will not. Instead, they have created a class of one, calling into question whether Allison actually believes that there is a distinct hazard to life or property in the design presented in EA's permit application.

50.     The Board ruled from the bench, affirming the City's denial.

## V.     ALLISON'S & THE CITY'S EGREGIOUS CONDUCT DAMAGED PLAINTIFFS

51.     Allison's and the City's factually unsupported refusals to approve the permit and their schemes to send EA chasing its tail have damaged all of EA, UTT and CTS.

13

52.    In all of its dealings with the Allison and the City, EA was clear there were third parties who were being damaged by their preventing EA from putting the property back to its original and customary commercial use.

53.    Yet EA, dating back to at least the early summer of 2022, was denied the ability to even start work in making that happen. This denial damaged all of EA, UTT and CT and continues to damage all three businesses, causing both financial and irreparable harm, Additionally, the value of the property is severely diminished. As is, the property is likely only valued at about $200K. With a repaired building for the same commercial use, it is reasonable to expect the value to range from about $1.5M to about $2.0M.

54.    Additionally, inflation has steeply impacted prices of materials and labor for construction work, including steel, over the past two years. As Defendants should have reasonably foreseen, deposits with contractors may be lost based on the City's denial and affirmance thereof.

## COUNT I
## INVERSE TAKING/CONDEMNATION UNDER 5th & 14th AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST THE CITY ONLY)

55.    Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

56.    This claim is being made pursuant to 42 U.S.C. § 1983.

57.    Plaintiffs are persons under 42 U.S.C. § 1983.

14

58.    At all pertinent times, the City's actions occurred under color of state law.

59.    The City denied EA's building permit and required EA to undertake unnecessary, burdensome and improper expenses which are specifically excluded under the properly applicable codes as a condition to receive a building permit.

60.    The City misinterpreted the codes and did not apply the correct standard or provisions of the codes to deny EA's building permit. In addition, the City's misinterpretations and failure to apply the correct code to the repair of the building at the property is an irrational and arbitrary decision by the City, including factual determinations that were not supported by substantial evidence.

61.    The misinterpretation and failure to apply the correct provisions of the codes to EA's permit application directly resulted in a denial of the request for a building permit.

62.    The EA property is zoned commercial and its ordinary use is as a vehicle sales and service facility. The actions of the City have deprived and continue to deprive Plaintiffs of the ordinary use of the property.

63.    The affirmative actions by the City were not to advance any legitimate government interest.

64.    The denial of procedural due process resulted in the denial of Plaintiff EA's permit to repair the building at the property.

65.     The denial of permit resulted in substantial hardship and damage to the Plaintiffs.

66.     Plaintiffs have suffered and continue to suffer great and material damages pursuant to 42 U.S.C. §1983.

67.     Plaintiffs are entitled to an award of damages as result of the City's violation of their rights under the United States Constitution, Amendment V and XIV.

## COUNT II
## INVERSE TAKING/CONDEMNATION UNDER ARTICLE I, §17 & ARTICLE X §2 OF 1963 MICHIGAN CONSTITUTION (AGAINST THE CITY ONLY)

68.     Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

69.     Under Article 10, § 2 of the Michigan Constitution of 1963, the government may not take private property for public use without just compensation therefore being first made or secured in a manner prescribed by law.

70.     This state constitutional provision protects intangible property, including equity in land and value of land use.

71.     The City abused its discretion and power in taking affirmative actions directly aimed at the 10200 Harrison Street property. These actions include misinterpretation and misapplication of the IBC and IFC to the repair of an existing building and the failure to apply the 2015 MRC. These actions, among others,

resulted in the imposition of excessive and improper expenses on EA and resulted in the denial of EA Plaintiff's permit to repair the building on the property.

72.     The City refuses to issue a certificate of occupancy to Plaintiff EA for the customary use of the property by EA, UTT and CTS without undertaking these excessive and improper expenses.

73.     As a result, the value of the property has greatly declined and the City's actions were a substantial cause of the decline of the property's value.

74.     The City's actions were the proximate cause for the decline in property value.

75.     The City's actions violated the Michigan Constitution's Takings Clause.

76.     The City has by these actions appropriated the property interest without using the mandatory process outlined under the Uniform Condemnation Procedures Act, MCL 213.51, *et seq*.

77.     As a direct and proximal result of the City's actions, Plaintiffs have suffered substantial monetary damages.

## COUNT III
## EIGHTH AMENDMENT VIOLATION
## 42 U.S.C. § 1983 EXCESSIVE FINE FORFEITURE
## (AGAINST CITY ONLY)

78.     Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

79.     The Eighth Amendment to the United States Constitution prohibits the government from imposing excessive fines.

80.     This prohibition against imposing excessive fines applies to actions(s) involving inverse takings.

81.     By imposing the excessive requirement forcing the EA Plaintiff to access the City water main across the street from the property and install a sprinkler system as part of a fire suppression system imposes an unnecessary cost of about $200K.

82.     This imposition of excessive and unnecessary cost on the EA Plaintiff violated the Eighth Amendment right to be free of excessive fines.

83.     The City' imposition of this unnecessary, excessive and improper cost prevents Plaintiff EA from securing a building permit to repair the existing structure on the property, thereby substantially reducing the value of the property.

84.     The conduct of Defendant was reckless, surreptitious and with complete indifference to Plaintiff EA's constitutional rights to be free from violations of the Eighth Amendment to the United States Constitution.

85.     Plaintiff EA has suffered injury and/or is entitled to an award of damages as result of Defendant's violation of their rights under the United States Constitution.

## COUNT IV
## PROCEDURAL DUE PROCESS
## (AGAINST ALL DEFENDANTS)

86.     Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

87.     It is unconstitutional to deprive a person of property without due process of law.

88.     The codes are intended to provide property owners with the minimum due process recognized by the United States and the State of Michigan's Constitutions in the maintenance of their properties. Property owners must be afforded the protections offered under the codes and the right of adequate notice of what code applies to their permit request to enjoy use of their property.

89.     Procedural due process requires reasonable measures to be taken when the City applies the codes to the use or maintenance of property and by the failure to enforce the provisions of the codes relating to existing buildings or to apply the correct code to the property, the City knows or should have known that they have failed to enforce the provisions of the codes.

90.     As a direct and proximal result of Defendants' actions, Plaintiffs have suffered substantial monetary damages.

## COUNT V
## SUBSTANTIVE DUE PROCESS
## (AGAINST ALL DEFENDANTS)

91.    Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

92.    Defendants and the City's official policymakers, and/or all acting in their official capacities and pursuant to customs, policies and / or practices, denied Plaintiffs their constitutional right to fair and just treatment during executive acts and deceptive communications from officials who intentionally acted and deprived Plaintiffs of their property.

93.    Defendants failed to apply the provisions of the IBC and IFC to EA's property which define "existing structures" as exempt from the provision in the IFC requiring automatic sprinkler systems and failed to apply the MRC to the existing structure which specifically exempts an existing structure being repaired from such a requirement if access to the water main sufficient to support the sprinkler system is not present.

94.    The access to the water main for the property is not sufficient to support the automatic sprinkler system wrongfully required by the City and Allison.

95.    Defendants have violated the 14th Amendment of the United States Constitution, as implemented through 42 U.S.C. §1983.

96.     Defendants and their officials in their individual and official capacities

engaged in conduct that "shocked the conscience" in the constitutional sense.

97.     Defendants conduct has no rational basis for violating Plaintiff's rights to

substantive due process.

98.     As a direct and proximal result of Defendants' actions, Plaintiff has suffered

substantial monetary damages.

**COUNT VI**
**PROMISSORY ESTOPPEL**
**(AGAINST ALLISON ONLY)**

99.     Plaintiffs incorporate by reference and assert here all the allegations

contained in the above paragraphs.

100.    Allison, whether in his personal capacity or his official capacity as the City's

Fire Prevention Chief, told Plaintiffs that if EA could get an insurance company to

write an insurance policy on the proposed repair of the building on the property,

Allison would not require the installation of the $200K sprinkler system as a

condition for a permit.

101.    Plaintiffs were led to believe by Allison that EA would be permitted to

repair the building and maintain its property rights if EA secured such a letter from

a reputable insurance carrier that it would insure the building without a sprinkler

system.

102.   EA relied upon Allison's representations and secured such a letter from a reputable insurance carrier. The letter was submitted directly to Allison.

103.   Even after receiving that letter, Allison continued to refuse a building permit on the ground that, notwithstanding his earlier representations and assurances, he still required EA to install a $200K automatic sprinkler system as a condition for a building permit to repair the existing structure.

104.   Plaintiffs were damaged as a result of their reliance on Allison's promises.

105.   As a direct and proximal result of Allison's actions, Plaintiffs have suffered substantial monetary damages.

**COUNT VII**
**GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

106.   Plaintiffs incorporate by reference and assert here all the allegations contained in the above paragraphs.

107.   The City and Allison have a duty to Plaintiffs to apply the appropriate codes as applicable to properties within the City of Romulus, and to act within discretionary bounds.

108.   EA's property is within the City of Romulus.

109.   The Defendants applied the codes to EA's property incorrectly by not applying the definition of an existing structure to the concrete platform on the property, thereby subjecting EA to unreasonable and unnecessary requirements and

costs not imposed on other owners of existing buildings. The unnecessary, unreasonable and expensive costs include requiring EA to install a $200K sprinkler system as a fire suppression system in the building EA seeks to repair. This breaches a duty to at least EA.

110.   City of Romulus will not issue a certificate of occupancy to EA for UTT and CTS to use the property for any reason unless EA complies with the unreasonable, unnecessary and expensive requirement of installing a $200K sprinkler system as a fire suppression system in the building Plaintiff seeks to repair. This breaches a duty to all Plaintiffs.

111.   These intentional and willful acts by Defendants rise to gross negligence because Defendants knew or should have known of the injury their acts would have on all Plaintiffs.

112.    Defendants acted with a lack of concern and with substantial disregard to the injury inflicted on Plaintiffs by imposing such requirements and thereby depriving Plaintiffs of substantial use and value of the property.

113.   As a direct and proximal result of Defendants' actions, Plaintiffs have suffered substantial monetary damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court grant it relief as follows:

1. For actual damages;

2. For treble damages;

3. For exemplary damages;

4. For permanent injunctive relief;

5. For any and all other equitable or legal remedies and relief that this Court

   deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all claims, counterclaims, defenses, and other issues so triable.

**Dated**: Feb. 17, 2023                     **Respectfully submitted,**

<u>s/Linda D. Kennedy</u>
Bill C. Panagos (P34068)
Linda D. Kennedy (P64692)
PANAGOS KENNEDY PLLC
3331 W. Big Beaver Rd. Suite 102
Troy, MI 48084
248.564.1343
bpanagos@paniplaw.com
lkennedy@paniplaw.com

*Attorneys for Plaintiffs*